The next case for argument is 15-1597, Asia Vital Components versus Acetec. The next case for argument is 15-1597, Asia Vital Components versus Acetec. Mr. Aitken, we've got another divided time situation, so am I correct that you're going to do ten minutes in the first go and that your colleague is going to do the five minutes reply? Yes, Your Honor. Whenever you're ready. May it please the court. Good morning. My name is Andy Aitken. I'm here on behalf of the appellant, Asia Vital Components Company. It's a company organized under the laws of Taiwan. We're here on appeal of a district court action that dismissed our complaint for declaratory judgment for patent invalidity and non-infringement. That was out of the Eastern District of Virginia. Let me ask you, what's troubling me here is really not so much the question of whether or not they knew of the products, the K7 and the K9, but the very scant allegation in your complaint with respect to where you stood in terms of producing your products. Let me just give you my thing. Because the complaint just says you've completed, I think, you've completed your designs and you intend to market and sell the products in the U.S. Now you give a lot of more detail and fulsomeness to those statements before the district court and certainly on appeal for us. But if we're left to the allegations in your complaint, how are those sufficient? Well, I would point to the actual complaint. When we did refer to the K7 and K9 as products repeatedly, the district court actually seized upon one instance where we called them prototypes. But in a number of paragraphs in the statement... But they weren't products, right? I mean, they weren't... There's no dispute. They were not products on the market, right? There is a dispute with respect to that. The district court found that they were prototypes and not on the market. At the time... Is there any evidence that they were being sold to anyone outside the United States? That's where they had been offered. My client is in Taiwan and they were seeking distribution and presenting... Let me just try to get the focus on what's in my mind. Was something other than a prototype, but rather units that the intended users were going to have, were those out in the marketplace in the hands of users using them? They were being offered for sale at the time of the complaint. And where's that? What's the evidence of that? Well, the evidence is the products are positioned to directly compete... I was actually looking for joint appendix citations. That's A67. ABC's customers for the K7 and K9 products have expressed concern that these were going to subject them to liability. So the customers had seen the K7 and K9 products and that's alleged in the complaint. I mean, that's implicit by their... That's paragraph 26. They have... The customers for them have expressed concern and that obviously the paragraph is not complete, but that these products are going to be the potential subject... But that's as specific as the evidence gets. We don't have anything that goes, for example, to the ready for patenting kind of standard that the Supreme Court articulated in On Sale Bar, which indicates a higher degree of completion so that the question of infringement might be better defined. We think that that may, well, is met by paragraph 24 where it said we'd completed the designs of the K9 products as manufactured... We called them prototype products, but intended to sell those products into the US. So the product had been completed. It was ready for patenting. It was ready for production. There's no suggestion of what the timetable is, whether you have the sufficient investment to do that or what. I mean, this could... Taking this at face value, this could mean and you intend to do it five years down the road, right? Well, I would suggest that would be impossible because the actual customers that had seen them by the time of the complaint based on paragraph 26, and they'd actually expressed concern with respect to liability. So we think the pleading is adequate to show that the product had been launched into the marketplace. And then before the district court, we actually did a side-by-side comparison showing the product that had been manufactured and compared it to an accused product. Is that in photographs or the actual physical thing? Has the other side seen this? That was a photograph of the product. It may be a separate question. Has the other side now seen the K7 and K9? I'm not certain. There's been no discovery that has taken place in the case. So we have no idea what the... What Asetek has seen or not seen. I mean, it was our suspicion that they had actually saw the K7 and K9, and that's why they had actually made a express threat of infringement in August after we told them we weren't responsible for the Enermax 120 that they had mistakenly accused us. They told us in an email, we still think you're infringing. And it was our assumption that they had probably come across the product somewhere, maybe even out of the country, or maybe it was in the country. We don't know because there was no discovery taken in the case. But they've represented that they didn't know, and the court made that finding. It was not an unreasonable finding. We don't take issue with that, but the fact is we... I'm not sure that this matters, but I guess I'd... You know something about where K7 and K9 units might have been in the world, because they're yours, right? So what is it? This is connected to the question whether, you know, did you have 10,000 of those units in users' hands in Taiwan at the time, or what? Well, unfortunately, I can't go back and supplement the record with that information. That's not a record. We believe, you know, and I'm not exactly certain because my client's in Taiwan, but there was product distribution. We had them review the complaint, and this is what, you know, based on some communications issues, that we were able to affirmatively represent to the court when we filed it. Certainly we could go back and find out exactly what the degree of distribution was, but that's not of the record, unfortunately. We can't come back now and supplement the record. We agree we're somewhat constrained to what we alleged in the complaint, and what we've court to explain what the materials in the complaint meant, but we're somewhat limited to just putting in new facts. We did present the declaration of Mr. Wang with respect to that, who actually discussed some of the clients of the K7 and K9 concerned. That's appendix A2. Yeah, but look at paragraph 23 where you say, on information and belief, the K7 and K9 products may have a number of structural similarities to the accused product sold by Kool-Aid, whatever. Firstly, there's a may in there. Secondly, we don't know what the number of structural similarities, whether that has anything to do with reading on the patents, so that's not helpful, is it? It could be more definite, but I think the case law is pretty clear. You don't have to admit that your product infringes. You just have to have a reasonable apprehension. You're going to get sued. As we presented this side-by-side photograph, it was almost ... When you look at these photographs, they're substantially identical to the Enermax that was accused. You look at this from the perspective of AVC, they don't have to come out and explain exactly what's ... Why they think their product may infringe. They don't have to do that. In this instance, Asetek made an express charge of infringement. We frankly think that ... But that charge of infringement was directed to a product that your client is not selling. We disagree with that. They made a express charge by letter in May of 2014. We responded to that letter and indicated that we were not selling that Liquimax 120 that was expressly identified. They came back and said, well, when this is on August 2nd, after we responded, it says, we still think that you are infringing our products in the United States. That's an express threat of infringement that we think reverses the other reasonable apprehension test. You weren't selling any products at that time. Correct. We were not selling ... Well, they weren't in the United States. We were attempting to sell, but we weren't selling. Actually an attempted ... An offer for sale is an infringement technically, so we think that that actually traverses the entire reasonable apprehension test. This is an express charge. Could I just go back to a statement you made a couple of minutes ago because I didn't hear it. I'm not sure I heard it correctly. You were saying something about the comparative charts between Liquimax 120 and your product. Where is there any suggestion in the complaint that there was a similarity between those? I'm looking at paragraph 22 that just states that they provided charts that demonstrated how the patents read on that, but I don't see where you're saying we're just like K7 and K9 are just like or very similar to Liquimax. Was that anywhere in the complaint? It's not in the complaint. We said it was similar to the Kool-Aid systems and Kooler Masters, which have been expressly ... They actually brought infringement cases against both of those products. What are we supposed to do with the point you were making, which I assume you think is appropriate to our determination about whether there ought to be a DJ here, which is this comparison between Liquimax and your products, if that's nowhere in the complaint? That's not in the complaint, I agree, but what is important is from the objective perspective from Asia Vital Components is they're getting cease and desist letters, express charges of infringement, and they have these products sitting there that they're attempting to introduce into the market. From their perspective, when they look at this Enermax directly with what they're making, they have an objective concern. Even if I accept what you're saying and agree with it, my concern is that I don't see that in the complaint. I agree. That specific is not in the complaint, but we believe we have it covered based on the similarities with the Kool-Aid and Kooler Master, which is just a continuum of similar products. Is there anything in the complaint that tells us that the Kool-It and the Kooler Master are like the Liquimax? No, we don't connect all the dots. I agree that there is not a direct statement in the complaint, but we tried to explain to the district court this is exactly why this mistake may have actually happened. The district court found that part of the reason why that comparison was presented before the district court is... What are you saying? What mistake would have happened? Why they erroneously initially accused you of doing it? But quite clear, they didn't know of the K7 and K9 products, right? The judge found that we don't know that. Those products were, at the time in the summer of 2014, it's my understanding they were out there trying to sell these products. They're not going to go present this to Assetek. To the extent... You're saying they. You mean your client. My client, right. They're seeking distribution. There are people throughout the world. This is a world market. It was not like they're going to confront their competitor and say, take a look at our products that we've developed. What do you think of these? Rather, they're selling to potential distributors to put their products into the market. Now, Assetek says they didn't learn about that. We understand that's not unreasonable for them to take that position. But the fact is, there's shows throughout the world where products are presented. There are meetings between distributors and people at meetings talk to other people. That's a complex factual finding at the end of the day. We're stuck with the district court's finding, unless it was clear error. But they've had two executives said they didn't know about the K7 and K9 products. We are stuck with that. We're not saying there was clear error in that finding, but we believe that there's sufficient information overall in the complaint. I would point out that we think the judge at the district court just focused on this issue and the test is really a totality of circumstances. We've also presented evidence regarding their aggressive enforcement actions. They did sue Coolit and Cooler Masters on these integrated pump solutions. They sent cease and desist letters to Enermax, another person in there. They didn't initiate that litigation. They contacted our customers, and that's clear from the pleadings as well, that the customers were concerned about this patent liability. So we think under this totality of circumstances test, combined with this express charge of infringement after we told them that the Enermax 120 was not ours, is adequate and more than adequate to confer Article III jurisdiction here. I think we have your argument. Thank you.  Good morning. May it please the court. Robert McCauley on behalf of Asetek. Your Honor, as I was sitting over here listening to Mr. Aiken argue, I was struck many times by so many points that he was making that have no basis whatsoever in the complaint. The complaint is bare. There's- But we're not limited to the complaint, are we? Your Honor- Your Honor's- Evidence, there's an evidentiary record here of which, to me, the most striking thing is your email, was it- I can't entirely tell because some of the characters are Korean, but August 2nd, was that the email at A207, after they told you that they're not responsible for the Lickmax 120, paragraph 4th says, please be advised that Asetek believes that ABC is likely selling other infringing products in the US. We're sure you're aware that Asetek enforces its IP and it has pending litigation against Coolit and Coolmaster, etc. So that, I take it, is some kind of assertion of your belief about infringement once you accept that they're not responsible for Lickmax. Their complaint says they've got prototypes of these other things. You don't know about the other things, but as I read our precedent, it's quite clear you don't have to know. And why shouldn't that be enough, given the essential policy of the Declaratory Judgment Act, that patentees should not, by mere, I don't want to call it threat, but the prospect of infringement, be able to freeze a competitor out of the market, with the competitor not able to get resolution of the issue. Your Honor, there were a lot of questions in there. I'll do my best to answer them. But all of this is all together. This is the story. This is really different? I mean, really outside the bounds of what the Supreme Court had in mind in MedImmune? Absolutely, Your Honor, for a variety of reasons. To answer the court's first question, Judge Taranto, we believe that the complaint sets forth the allegations upon which declaratory judgment jurisdiction should be determined. We did file a facial challenge to the complaint, and then there was some evidence that was adduced. It's our position that the evidence that ABC presented should have been presented to support or substantiate the allegations that were in the complaint, but not add new allegations. We believe they did that in a couple of respects. I will also say in all candor to the court, I'm not aware of any cases that discuss the cleavage between what might be in the complaint and what is in the affidavits that are submitted in the Rule 12B proceeding. But nevertheless, even if you consider the affidavits that were submitted on behalf of ABC in connection with ACETEC's Rule 12B challenge of the facts, they are very vague, and they are not sufficient to establish subject matter jurisdiction or a case for controversy. There were a lot of states... is short of asserting that it infringes that isn't reasonably implicit in what they did say. They're not required to say, our product infringes. That would be, A, would be ridiculous, and B, we've said that's not required because it would be ridiculous. So what should they have said? Your Honor, forgive me, I didn't mean to interrupt the court. What they should have said is that their product has structural similarities that are relevant to the claims in the case. And we sent them a claim chart with respect to the Intermax product that could have been an easy template for them to use to focus on certain elements of the claimed invention. For instance, the claimed invention is specific. It refers in Claim 1 of the 362 patent to a reservoir that's divided into an horizontal wall that has certain passages, et cetera. We sent them a claim chart that mapped that. They made absolutely no attempt to try to say or explain in their complaint or in their affidavits that the K7 and K9 products, which Asetek was unaware of, had the same structural... had the same structure or were even close to what was... Then what infringing products were being referred to in the letter on the appendix page 8207, the letter that Judge Toronto referred to a moment ago? Well, Your Honor... It says, please be advised that Asetek believes that ABC is likely selling other infringing products in the United States. What products does that refer to? Well, Your Honor, I can say it did not refer to the K7 and the K9 products. At this point, I cannot recall specifically what was being referred to there. But it was obviously something other than the Lickmax 120. That's correct, Your Honor, because they had assured us that they were not selling the Lickmax 120. So there was an assertion there of infringement based on these patents. Your Honor, respectfully, we disagree with the characterization by ABC's counsel that this statement at 8207 in the record is an express charge of infringement. What it says is that Asetek believes that ABC is likely selling other infringing products in the United States. It doesn't identify any products whatsoever, and certainly not the K7 and the K9 products. The case law doesn't require the identification of particular products, does it? Your Honor, there are three cases that ABC is relying on to try to state that products don't need to be identified. The first thing I'd like to point out is they face what this court referred to as a high barrier in the Prasco decision, because Asetek never made any kind of assertion or a concrete claim of a specific right, and there's no objective evidence that we ever believed or planned to assert the patents against the K7 or the K9 prototypes. They do have a high burden. There are three cases that they attempt to rely on to try to state that products don't have to be identified. Your Honor, those cases are a rarity in the spectrum of jurisprudence that has developed in this area. Well, if they're precedential opinions, and if they do say that you don't have to identify the product, that you may consider them a rarity, but we consider them precedent. Your Honor, they are precedent, but they're all distinguishable, which is the point   that I'm trying to make here. There are a number of cases that are involved, refer to processes. One of them is the Dewey case, which is a 1940 case from, I can't remember the circuit. Third, I think. Thank you, Your Honor. That was cited with approval in the Arrowhead case by this court. In both those cases, you have processes. In the Dewey case, it was a coagulant dip manufacturing process for making rubber, and then in the Arrowhead case, it was deoxygenation, I have trouble saying the word, deoxygenation process. And there was no dispute that that process was being employed by the declaratory plaintiffs in those cases. In this case, we don't have a situation where Asetek has accused a process, and ABC is doing the same process. Asetek has accused some specific products against other competitors, in this case, Kool-It and Cooler Master. And there's no allegation that their products are the same, that ABC's K7 and K9 prototypes are the same as the products that Asetek sued. That was the situation. Forgive me, Your Honor. I'm sorry. The assertion is structural similarities, and they might have said structural similarities in a way relevant to the patent. I'm not sure why that's not implicit. In other contexts, and I guess I'm thinking of, I forget whether it's ANDA or the new or biosimilar act, the way you get DJ jurisdiction sort of indirectly is to say something as general as, our product might reasonably be accused of infringement. And that suddenly supports DJ action. You don't have to do mapping or anything. Why in context is this not enough, including the context of your, the JA207 email, yeah, I guess full stop. Why is that not what the Supreme Court in MedImmune meant? Very deliberately trying to expand the opportunity for resolution of possible patent barriers that freeze people out by risk averseness of the market. Your Honor, the reason is, this case is different because we never accuse these products. The statement, as I was saying earlier, at A207 in my email, that we believe it's likely that they're infringing other products. Can you focus for me on, I mean, it seems to me, starting with MedImmune, there's lots of opportunity to find uncertainty about how much definiteness of various sorts one needs. Lots of judgment opportunity. Just focus for me on what I take to be the core policy. Somebody in Asia Vital's position might decide to stay out of the market unnecessarily for fear that you're going to sue them for infringement. And they might wait and wait and wait and you get the benefit of that. D.J. actions under MedImmune are supposed to avoid that, to attack that very specific thing. Why is this not within that policy? Your Honor, respectfully, they have not alleged those facts in their complaint. And to answer the question that the court asked me earlier, Judge Toronto, it's not alleged in the affidavit by Mr. David Wang either. There's a lot of argumentation in the papers by counsel that's pure attorney argument that finds no support in the complaint. I thought Mr. Wang said, I've talked to at least two customers and I'm paraphrasing something and maybe the paraphrase is incorrect in a critical way. But they have told me that they've even heard from you, Asetek, and feel that they might be sued for infringement if they deal with, if they buy these products. Forgive me, I didn't mean to interrupt you, Judge Toronto. That's paragraph 4 at A213 of the appendix. And specifically, what Mr. Wang says is that he has had conversations with iBuyPower and Thermaltake. And according to him, and by the way, Your Honor, this is all an admissible hearsay, but we can set that aside for the moment. He says that... Just to confirm, I mean, hearsay is fine on summary judgment, isn't it? No, Your Honor. All you have to do is point to admissible evidence. Your Honor, the case law that we cited at page 12 of our brief that was submitted in this case makes clear that they have to present competent admissible evidence. Point to it, is the way that Rule 56 is written. I'm sorry, Your Honor. Rule 56 says you have to point to the evidence. You don't actually have to submit evidence. So why is this... We may be on a detour here, so I guess I'd rather get back to the substance of this. Well, can I take another road off the detour, which is that you've been talking about the complaint. 26 in the complaint says that. It does refer to the fact that customers have expressed concern. So to the extent that you were quibbling with Judge Toronto in terms of use of other evidence versus what's actually asserted in this complaint, why isn't... Let's look at the language of the complaint, that they're operating under fear of the possibility of liability. Your Honor, it does state that the... I am referring to paragraph 26 in the complaint at A67. It says that ABC's customers for the K7 and K9 products have expressed concern, and then there's some missing words in here, that will subject them to liability under the asserted patents. It doesn't say anywhere in the complaint that Asetek has ever told any customers that the K7 or K9 will infringe. There's no allegation of that. The thing that's telling, Your Honor, is if you look at the declaration of David Wang that was provided to try to support the allegations in the complaint, there is very little in there at all about the substance of what we're now discussing. In particular, nowhere does it talk about the state of K7 or K9 as of the date that the complaint was filed, which is a conspicuous absence, Your Honor. They were under the obligation to try to establish that as of the date the complaint was filed, September 30th of 2014, that they were, in their words, ready, willing, and able to sell these K7 and K9 products. And there's nothing in the Wang affidavit or any of the affidavits that comes anywhere close to that. The Wang affidavit actually doesn't even mention the K7 or the K9 until the final page in the final paragraphs where it's there addressing issues that are relevant to a motion to transfer. Can I ask you a question I asked the opposite side, even though it really belongs to you? Have you now seen the K7 and K9? No, Your Honor. Still have not? I have not. I don't mean you personally, Mr. McAuley. I mean you and your client. You're right, frankly. And let's extend it to all of Finnegan. I mean, you in the relevant sense. Frankly, Your Honor, I don't know whether anyone at my client has seen the K7 or the K9. Candidly, Your Honor, this is all not relevant to the allegations that are supposed to be evaluated as of the date that the complaint was filed. But I don't know the answer to that question. If we were going to assert, if Asetek were going to assert that those products infringe, I would know about it. I'm lead litigation counsel for Asetek on many matters. And I'm not familiar with anything along those lines. I guess I have to go ahead. What is the status of the other litigation? And you've got this suit going on in Northern District of California, right? I'm sorry, Your Honor. That's a question. We had a case against Kuhl that it settled. We had a case against a Kuhler master entity. And that case is currently up on appeal. It went to trial. The jury found in favor of Asetek on all counts. Okay. But to get back to the point that I was just elaborating on and I see I'm running out of time, Your Honor, the Wang affidavit says nothing about the state of the K7 or K9. And it doesn't establish the immediacy or the reality prongs of the Supreme Court's test in MedImmune and all the like. Counsel has argued in their papers that there were expressed threats of infringement. Your Honor, we don't believe that's accurate. First of all, there were no accusations against any ABC products in the writings or at the meeting. I'm sorry. Just accusations that began all of this against what you believed to be an ABC product. That's correct. And then when I gather you became convinced that the K7 was an ABC product and in that JA207 document you say you actually believe there are other infringing ABC products. And by the way, we've sued Kulit. Pretty serious. The word threat is too ambiguous to be used here. But you don't need an accusation anymore after MedImmune. You just need whatever enough reality and immediacy is to, I think, get to the policy that resolution so that the mere fear isn't keeping people out. So you have an answer. I'm sorry. I'm not sure I understand the Court's question. I don't know why you, it is, you said there was no accusation of infringement of an ABC product. There was an accusation of infringement by what, at the time you made this statement of accusation, you believed to be an ABC product. Your Honor, I'd like to respond to that in three parts, and I know I'm running out of time. The first is the first letter. That was an accusation, but it was a mistaken accusation because they didn't manufacture the LickMax. That was cleared up, and we dropped the matter. We didn't pursue it. They wrote us back, and they said, we'd like to talk to you. We'd like to get together, and we said, we don't see a point in getting together. You said you don't make the LickMax. What is there to talk about? This is all in the record, and then they responded and said, we want to talk about matters of mutual cooperation, and then we responded and said that we would meet with them, but Your Honor, the point that I've been trying to get to is, after all of these correspondence that the Court has been asking me questions about in the record, the parties had an actual meeting that was requested by ABC. The parties sat down, and there was absolutely no discussion. There was no accusation of any infringing products at that meeting. Andre Erickson has testified to that in his declaration, which is in the record at 8282. Mr. Tuzi submitted a declaration that's also in the record that says he agrees that the K7 and the K9 were never discussed, and there was no accusations of any ABC products in that meeting whatsoever. We think that that completely dispelled any possible objective apprehension of a lawsuit being filed by ABC, excuse me, being filed by Asetek in this situation. You can look at that string of correspondence, and we don't agree that those were specific threats of infringement toward ABC products. You can disagree with me on that, but if you look at the actual meeting that happened, the face-to-face meeting where there were no accusations that were made about any products at all, and then we get sued a month later, we were caught completely off guard by surprise. There was no mention of anything about the K7 or K9 or a lawsuit coming. There was no attempt to clear the air. I think we have your argument. One more sentence. Thank you, Your Honor. We believe that under the circumstances that I've just described, that the lawsuit that was brought here does not comport with the purpose and intent of the Declaratory Judgment Act. Thank you. Thank you, Chief Judge Frost, and the panel. May it please the Court, my name is Cameron Toosey, and I just want to sort of take off on a couple of the comments that have been made. First of all, with respect to your question, Judge Toronto, of whether the product has actually been seen, it actually has. I understand if Commissioner McCauley doesn't recall, but in court, I actually held it up and showed it to Judge O'Grady. So that answers the question. Did they get to put their hands on it? They didn't put their hands on it. I don't even know. Is this something that if you see it, you can tell what the relevant components are, or are they all inside some casing? Well, it's relatively easy to take apart. Well, only if you have it in your hands. Yeah, if you have it in your hands, you can take a look at it. But at this point, recall, we've been in the very unconscionable position of essentially having to kind of infringe, as you well know. I mean, it's in the record here, as you've already discussed, with respect to... Well, where does that take us, though? I mean, how does that count for your side? It takes us to a place, I think, that goes beyond where MedImmune was supposed to go. I think it takes us to a place of great uncomfort, discomfort, maybe that's the correct word, for where AVC is sitting. It basically cannot... Well, you can't be saying that because you filed a DJ action, it should count in terms of your apprehension of liability, because now that you've filed it, they're going to know or guess, suspect, that you're infringing and turn around the file. That can't be one of the components we consider, right? Well, Judge Pross, I think one of the things that is in the record that may not be that easy to...  is there is a history between the companies. I mean, in 2007, Asetek had reached out to AVC, which is a major manufacturer, and wanted them to OEM its products. And over an IP dispute, there has been ongoing disputes between the company. So if you're looking objectively at where AVC is sitting, it's got that issue going on. During the licensing discussions, the CEO specifically mentioned to me that because of the bad acts and problems that he's had with AVC... Is this part of the record that you're referring to, what the CEO said to you? It's part of it with the lower court. It is part of it. But what's the legal bearing of all of this? I mean, obviously, your two companies are not bosom buddies at the moment. So what? I mean, tie it to something that's part of our consideration of whether there's sufficient immediacy and reality of a patent dispute that comes within the meta-immune idea that the courts should take their time and put the patent holder to its time to litigate and resolve a potential patent dispute. What's all the bad blood have to do with that? Well, again, because it's an objective test, where you have to sit in the shoes of AVC... And again, one of the issues that we keep dealing with is that Finnegan, on behalf of Asetek, is continuing to say, well, we didn't accuse the case of any K-9 products. But where our company was sitting, aside from that issue that I mentioned to you, in addition, there is an opposition against one of AVC's patents that's occurring. So again, there are some problems between the company, and then they get hit with a letter regarding infringement of the Intermax product, which looks very close to the case of the K-9. So if you're AVC, you're getting very concerned and worried at that point. And it was clear that there was a threat there, but there were claim charts and everything else. So our company responds back that, you know, we don't make that product, and they respond back, but we still think that you're infringing. So here we are, and then if you would... I'm sure you've seen the affidavit of Andrew Aiken, which is on 8253 of the Joint Appendix, where there is, 8255 specifically, there is a picture that we had in the brief as well, of the Liquimax product compared specifically to AVC's K-7, K-9, excuse me, K-9 specifically. And if you look at the components with respect to, you know, the claim elements of mine, the assembly and the heat exchange plate and the Intermax liquid pump head, they're awfully close, and it's a fairly broad claim. Any one further comment? Just one quick question. Mr. Tucci, the email we were referring to on A-207 that says, please be advised that Acetec believes that AVC is likely selling other infringing products, that was dated August 2nd, 2014, correct? Yes, I think so, Your Honor. So, and the meeting that took place took place the week after, or two weeks after, August 13th. Is that right? I believe so. So you have a letter that says, Acetec believes AVC is likely selling other infringing products, and then a few days later you meet, and according to your affidavit, the K-7 and K-9 products were not discussed during that meeting. Well, Your Honor, this was a discussion to resolve disputes between the companies, and they have ongoing pending... Is there any discussion about what was meant by this letter, or what is it you're accusing us of doing? Yes, the specific products were not mentioned, but we were talking about a license, because it's not in our interest to bring up all the products that may or may not be infringing. We could do a list, and that's really not fair to us. Just like any kind of a licensing discussion, you would want a complete resolution, and then a full license of the patent for any products that you make. That's the only reason it wasn't discussed. It wasn't so that we could just... You didn't say, I don't know what you're charging us with because we're not infringing anything? No, Your Honor. This was a discussion in order to try to resolve the dispute. So basically, we said, okay, where are you coming from? And we wanted to get more input regarding whether they would provide, in the first place, any kind of a license. And again, as I mentioned, the CEO said that there's been bad blood. We're not concerned with that. And then after that, he quoted a very high rate, something like 16%. And that would have been in the... You could find that in the affidavit, though. Okay. Thank you. Thank you very much. Thank you. We thank all parties, and the case is submitted.